## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERIN COLEMAN** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO.  22-1445** |
| | : | |
| **CHILDREN'S HOSPITAL OF** | : | |
| **PHILADELPHIA** | : | |

**McHUGH, J.**                                                                    **November 8, 2023**

## MEMORANDUM

Plaintiff Erin Coleman brings this action against her former employer, the Children's Hospital of Philadelphia (CHOP), alleging discrimination and retaliation after her medical leave for gallbladder surgery and COVID-19.  She seeks relief under the Americans with Disabilities Act (ADA) and the Family and Medical Leave Act (FMLA).  Defendant CHOP now moves for summary judgment on all claims.  Because I conclude that Plaintiff has not made a sufficient showing that her suspension and termination resulted from her medical conditions or use of leave, I will grant CHOP's motion in its entirety.

### I.    Factual Background

Plaintiff Erin Coleman[1] is a registered nurse and former employee of Defendant CHOP. Pl.'s Opp'n Br., Ex. A at 15:5-10 (ECF 33-1) ("Pl.'s Dep.").  Plaintiff asserts that she was a strong employee on track for promotion, but in October, 2020, she began suffering "from a clogged duct in her [gall]bladder, which was preventing appropriate blood flow and caused her to suffer from nausea, vomiting, fatigue, among other negative side effects."  Second Am. Compl. ¶¶ 9-24 (ECF 20).  "This medical condition interfered with major life activities including but not limited to

---

[1] Plaintiff's surname has since changed to "Rooney," but I will continue to use "Coleman" as does Plaintiff.

performing manual tasks, eating, digestion, and the proper flow of blood throughout Plaintiff's body." *Id.* ¶ 25.

Plaintiff needed an urgent cholecystectomy to remove her gallbladder, and CHOP granted her FMLA leave accordingly. *Id.* ¶¶ 28-31. After a six-week recovery period, including extensions for post-surgery complications, Plaintiff returned to work in November, 2020. Pl.'s Dep. at 40:14-15; Pl.'s Opp'n Br., Ex. B ("Pl.'s Timeline"). Shortly after her initial return, Plaintiff contracted COVID-19 and was forced to take additional time off. Pl.'s Timeline. She returned to work for the second time in January, 2021. *Id.*

Upon her second return to work – about three months after her gallbladder removal surgery – Plaintiff alleges that "the entire atmosphere at the office and the attitude of her supervisors towards her changed completely." Second Am. Compl. ¶ 92. Before taking leave, CHOP supervisors had allegedly expressed clear interest in promoting Plaintiff. *Id.* ¶ 22. But, she contends, upon her return "those considerations abruptly ended." *Id.* ¶ 94. She alleges she was being "put down, isolated, and doubted," and "began suffering from a campaign of retaliation that included unfair criticism, unsubstantiated allegations, a sham investigation and pressure to resign." *Id.* ¶¶ 42, 96. Plaintiff identifies two specific examples of this retaliatory campaign. First, she alleges that her manager expressed "surprise" that Plaintiff could still lead a meeting just as before her leave. Second, Plaintiff alleges that her manager counseled her about improperly refunding paid-time-off, even though Human Resources had suggested she do so. *Id.* ¶¶ 37-42, 43-48.

On February 25, 2021, CHOP suspended Plaintiff for allegedly "falsifying her timecard and lying about it" and fired her five days later, on March 2, 2021. Def.'s Mot. for Summ. J. at 11 (ECF 27); Pl.'s Timeline. Plaintiff claims that CHOP never contacted her to fully investigate these allegations or solicit her explanation, and that she was fired "without ever being told what days

she was accused of stealing time, or what circumstances led to her being accused." Second Am. Compl. ¶¶ 52, 55. She claims the allegations were merely a pretext to terminate her, and that "[t]he real reason for her termination was her disability/perceived disability, her reasonable accommodation, and/or her need for FMLA qualifying leave," in violation of the ADA and FMLA. *Id.* ¶¶ 67-68.

With discovery complete, CHOP now moves for summary judgment.

## II.    <u>Standard of Review</u>

This motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    <u>Discussion</u>

Plaintiff makes three claims against CHOP via two counts: (1) discrimination under the ADA, (2) retaliation under the ADA, and (3) retaliation under the FMLA. For the reasons below, I conclude that Plaintiff has failed to set forth evidence upon which a reasonable jury could find that she established prima facie cases of discrimination or retaliation under the ADA and FMLA.

A.    <u>Plaintiff's ADA discrimination claim fails because she has not established a prima facie case that she was disabled at the time of her firing.</u>

The ADA prohibits covered employers from discriminating against individuals based on their disabilities. 42 U.S.C. §§ 12112(a)-(b). Plaintiff claims that CHOP violated the ADA by terminating her because of her real and perceived disabilities.

"The *McDonnell Douglas* Title VII burden shifting rules apply to claims of discriminatory treatment under the ADA." *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To survive summary judgment, Plaintiff must first establish a prima facie case that: (1) she was disabled

3

within the meaning of the ADA; (2) she was otherwise qualified for the job, with or without reasonable accommodations; and (3) she was subjected to an adverse employment decision as a result of discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). If Plaintiff can establish her prima facie case, the burden then shifts to CHOP to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Walton*, 168 F.3d at 668. And finally, if CHOP provides a "legitimate, nondiscriminatory" reason for firing Plaintiff, the burden shifts back to Plaintiff to "point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (citation omitted).

CHOP contests the first and third prongs of Plaintiff's prima facie case, *i.e.*, challenging both whether she suffered from a statutory disability, and whether she suffered any adverse employment decision because of that disability.

### i.    Plaintiff has not plausibly established that she was disabled under the ADA.

The threshold question is whether Plaintiff was disabled at the time of her termination.[2] *See Showers v. Endoscopy Ctr. of Cent. Pa., LLC*, 58 F. Supp. 3d 446, 460 (M.D. Pa. 2014) ("A plaintiff is disabled within the meaning of the ADA only if she had a disability at the time of the adverse employment decision."). Necessarily, if she has not provided sufficient evidence of a disability, then she cannot assert a case of discrimination related to a disability. A disability under

---

[2] Plaintiff was suspended on February 25, 2021 and terminated five days later on March 2, 2021. Pl.'s Timeline. Plaintiff has not alleged any changes to her medical conditions during this five-day window, and the suspension was the first disciplinary action she alleges. I therefore view February 25th as the date of CHOP's first "adverse employment action" and the commencement of Plaintiff's termination process. "An adverse employment action is one which alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012).

the statute means: (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Notably, the 2008 ADA Amendments Act (ADAAA) clarified that the definition of "disability" should be construed "in favor of broad coverage of individuals . . . to the maximum extent permitted."  *Id.* § 12102(4)(A); *see* 29 C.F.R. § 1630.1(c)(4) ("The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.").[3]

Plaintiff contends that both her gastrointestinal condition and COVID-19 symptoms were disabilities at the time of her firing because they were actual impairments that substantially limited major life activities, and that even if they were not, CHOP regarded them as such.  I find that no reasonable jury could accept these contentions as to either medical condition.

*Gastrointestinal Condition*

Plaintiff claims that she suffered from an "ongoing, episodic and serious GI condition [that] substantially limited her ability to perform a major life activity" at the time of her firing.  Pl.'s Opp'n Br. at 13 (ECF 33).

Initially, at deposition, Plaintiff testified that her gallbladder surgery-related symptoms had resolved by the time of her firing:

> Q.  The specific surgery that you had, was that gallbladder removal surgery?
> A.  Correct.

---

[3] CHOP cites the Third Circuit's decision in *Sulima* (602 F.3d at 185) to argue that "a nonpermanent or temporary condition cannot be a substantial impairment under the ADA."  Def.'s Mot. for Summ. J. at 13; *see also* Def.'s Reply Br. at 7 (ECF 34).  This is patently misleading, as *Sulima* expressly interpreted the stricter, pre-ADAA version of the statute, 185 n.2, and cited pre-ADAA cases for the position CHOP now advances.  *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 765 (3d Cir. 2004) (citing *McDonald v. Commonwealth*, 62 F.3d 92 (3d Cir. 1995) and *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375 (3d Cir. 2002)).  CHOP repeats that error by citing those same pre-ADAA cases to argue that employers cannot regard temporary injuries as disabilities under the ADA, Def.'s Mot. for Summ. J. at 15, ignoring current law.  *See Myatt v. Village*, No. 19-130, 2019 WL 22881116, at *3 (E.D. Pa. 2019) (Sanchez, C.J.).

Q.  At a certain point after the surgery did your symptoms that led to the surgery resolve?

A.  After a period of time they did, yes.

Q.  When did you consider the symptoms to be resolved?

A.  Completely resolved? It was after I had returned back to work.

Q.  At some point while you were working at CHOP –

A.  Correct.

. . . .

Q.  Do you have any ongoing medical conditions for which you see a doctor?

A.  No.  I just – a GI.  I still have to go every year for a colonoscopy to follow up with the liver and the stones and ultrasound every two years, and then just my routine eye appointments and whatnot.

Pl.'s Dep. at 52:17-53:5; 74:12-18.

But after CHOP moved for summary judgment, Plaintiff attempted to oppose the motion through a supplementary affidavit.  There, she attests that her "gallbladder surgery and [] post-operative treatment and recovery was not an isolated incident, [but rather] is part of an ongoing gastrointestinal condition for which [she is] still being treated up to the present day."  Pl.'s Opp'n Br., Ex. I.  As evidence of this ongoing condition, she claims to "continue to suffer from gastrointestinal flare-ups," and says she must see a gastrointestinal specialist and undergo annual colonoscopies.  *Id.*

"[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict. This principle of summary judgment practice is often referred to as the 'sham affidavit doctrine.'"  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir. 2007) (citations omitted).  If a party fails adequately to explain an apparent contradiction between deposition testimony and a subsequent affidavit, a district court may disregard the affidavit.  *Id.* at 254.

Plaintiff's affidavit appears in material respects to constitute a sham affidavit.  Plaintiff signed the affidavit on October 4, 2023, more than one month after CHOP filed the present motion

and one day before Plaintiff filed her response.  The affidavit also contains two contradictions from her sworn testimony: (1) whether the symptoms that she claims constitute a disability "completely resolved" and (2) whether she has an "ongoing medical condition."  Plaintiff attempts to justify these contradictions in her sur-reply.  Pl.'s Sur-Reply at 2-6 (ECF 35).  She argues that (1) her testimony only detailed when her specific gallbladder-related symptoms resolved, not her more general gastrointestinal issues, and that (2) her mention of follow-ups with a GI specialist is itself evidence of an "ongoing medical condition."  *Id.*  But as to the first point, when asked under oath if she had any "ongoing medical condition," she definitively answered "no."  And as to the need for annual evaluations following the surgery, that is no different than any number of medical conditions that are monitored on a regular basis and cannot be deemed a disability.[4]

For that matter, even if I accepted the affidavit, it would fall short of establishing a disability.  The 2008 amendments to the ADA provide that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).  "Flare-ups" or symptomatic episodes do not suggest impairment of major life activities.  The fact that Plaintiff has submitted no medical records documenting such episodes nor sought any accommodation further weighs against her.  *See* 29 C.F.R. § 1630.2(g)(3) ("Where an individual is not challenging a covered entity's failure to make reasonable accommodations and does not require a reasonable accommodation, it is generally unnecessary to proceed under the 'actual disability' or 'record of' prongs[.]").

---

[4] It bears mentioning that according to the National Library of Medicine, maintained by the National Institutes of Health, cholecystectomies are performed approximately 300,000 times per year, and are now done laparoscopically.  The principal long-term risk is damage to the adjacent bile ducts, and there is no indication that such injury occurred here.  Kenneth R. Hassler et al., Laparoscopic Cholecystectomy, Nat'l Libr. of Med. (last updated Jan. 23, 2023), https://www.ncbi.nlm.nih.gov/books/NBK448145/ [perma.cc/Q4GB-M6RF].

On the record as it stands, Plaintiff underwent a laparoscopic cholecystectomy and then went through a period of recovery with, perhaps, gastrointestinal episodes thereafter.[5]   No reasonable jury could find this to be a disability under the statute.

As to whether CHOP representatives regarded her as disabled due to a gallbladder or gastrointestinal condition, Plaintiff has offered only one conversation in which her gastrointestinal issues were mentioned by a supervisor after her return to work.  While discussing Plaintiff's post-surgery complications, her senior supervisor, Tracey Widmer, is reported to have said, "Oh, well, if [you] would have had a private bathroom in a private office [you] could have maybe been able to come back sooner."  Pl.'s Dep. at 59:3-14.  But this comment addressed Plaintiff's condition while recovering and on leave and offers no suggestion that Widmer would have viewed Plaintiff as disabled by the time of her termination nearly two months later.  Plaintiff has also described conversations with her direct supervisor, Megan Menke, during which Menke asked if Plaintiff could continue to lead and attend meetings as she had before her surgery.  Pl.'s Dep. at 61:6-17, 63:9-64:4.  But when asked, "Did you believe that Meg[]an Menke had a concern about whether you had recovered following your gallbladder removal surgery," Plaintiff definitively replied, "No."  *Id.* at 61:2-5.  Plaintiff, aware that "transitory and minor" conditions do not support a claim under § 12102(3)(B), seeks to emphasize the seriousness of her alleged flare-ups. Pl.'s Opp'n Br. at 13-14.  Even if I were to accept that Plaintiff's gastrointestinal issues were not "minor,"

---

[5] Plaintiff emphasizes the pre-surgery symptoms leading to her gallbladder removal surgery in October, 2020, as well as her post-surgery complications shortly after.  Pl.'s Opp'n Br. at 4, 14.  But these symptoms and complications are not relevant here because they had already resolved by the time she was terminated. Pl.'s Dep. at 52:17-53:5; *see Rocco v. Gordon Food Serv.*, 998 F. Supp. 2d 422, 427 (W.D. Pa. 2014) (finding no prima facie disability, "even under the less-restrictive interpretation required by the ADAAA," because Plaintiff's injuries had subsided prior to his termination); *Showers*, 58 F. Supp. 3d at 452, 460-61 (accepting that cancer in remission may be a disability under the ADA because it could return, but not because of its prior effects or the need for annual check-ups).

however, there remains insufficient evidence that CHOP representatives considered Plaintiff disabled when they terminated her.

*COVID-19 Symptoms*

Plaintiff further argues that her COVID-19 symptoms constituted an "actual disability" under the ADA at the time of her termination. Pl.'s Opp'n Br. at 17. Since the 2020 pandemic, courts have wrestled with the ADA's application to COVID-19 symptoms. *See Cappel v. Aston Twp. Fire Dep't*, No. 23-155, 2023 WL 6133173, at *17-18 (E.D. Pa. Sept. 19, 2023) (Murphy, J.) (reviewing cases). There is, however, a consensus that what has been termed "long COVID" may constitute a disability under the ADA depending on the duration and severity of symptoms. *See* HHS & DOJ, *Guidance on "Long COVID" as a Disability Under the ADA, Section 504, and Section 1557* at 2, 4 (2021) (explaining that "[l]ong COVID can substantially limit a major life activity" through symptoms like "fatigue" and "brain fog").

Plaintiff's only evidence for a COVID-19-related disability is her deposition testimony. She explains that after her COVID-19 bout ended in December, 2020, she experienced a lingering cough and "COVID fog," but it resolved no later than early February, 2021:

> Q. After you came back from work did you have any continuing symptoms from COVID-19?
> A. I still had a lingering fatigue, a cough that progressively got less. But the fatigue or they called it the COVID fog definitely hung out for a little bit.
> Q. Approximately how long did you have fatigue?
> A. I would say I did not truly feel myself probably until the end of January, maybe early February.
> Q. After you came back from work initially after your COVID-19 diagnosis did you have to take any other time off from work because of COVID-19?
> A. Not that I recall, but I would have to go back and look.
> Q. Did you have to change any of your work activities after you came back from work because of COVID-19?
> A. None of my – like, I didn't have any type of accommodations or anything set, no. I came back to full duty.

Pl.'s Dep. at 67:8-68:5.

9

Plaintiff was suspended by CHOP on February 25, 2021, and ultimately terminated on March 2, 2021.  Pl.'s Timeline.  Thus, Plaintiff's own testimony establishes that by the time she experienced an adverse employment action, she had no ongoing symptoms or issues related to COVID-19, as they had all subsided weeks earlier.  Here again, she offers no medical documentation that her COVID symptoms were ongoing, nor did she request an accommodation[6] or notify anyone at CHOP of an ongoing COVID-related condition.  Pl.'s Dep. at 67:24-68:5.  She also has not indicated how any major life activities were substantially limited by COVID-19 symptoms at the time of her firing.  No reasonable jury could find that Plaintiff's COVID-19 symptoms constituted a disability under the ADA when she was fired.

Plaintiff likewise offers no evidence beyond her own speculation that CHOP regarded her as disabled due to COVID-19 when they fired her.  Plaintiff's view is that because CHOP knew of her COVID-19 diagnosis and initial symptoms in December, 2020, a reasonable jury could extrapolate that CHOP still regarded her as disabled when they terminated her roughly three months later.  Pl.'s Opp'n Br. at 17-18.  To make this point, Plaintiff relies exclusively on a case where the employer had fired its employee on the "very same day" it learned of the employee's COVID-19 diagnosis.  *Matias v. Terrapin House, Inc.*, No. 21-2288, 2021 WL 4206759, at *4 (E.D. Pa. Sept. 16, 2021) (Leeson, J.).  Such a strong temporal inference is absent here.

### ii.     Plaintiff has not plausibly established a prima facie case that she was subjected to an adverse employment decision because of disability-based discrimination.

Even if Plaintiff could establish that she was disabled under the ADA when she was fired, she cannot plausibly show that CHOP terminated her because of the disabilities she asserts.  To

---

[6] A sub-heading in Plaintiff's opposition brief notes that she "required the reasonable accommodation of working from home" because of her COVID-19 diagnosis in December, 2020.  Pl.'s Opp'n Br. at 17.  But that accommodation was met by CHOP and no longer relevant when Plaintiff resumed in-person work in January, 2021.

establish a prima facie case of discrimination, Plaintiff must "prove that [her] disability was a determinative factor in the Company's decision to terminate [her]." *Kairys v. S. Pines Trucking, Inc.*, 75 F.4th 153, 161 (3d Cir. 2023) (citation omitted).  Doing so then "raises an inference of discrimination only because we presume [that her firing], if otherwise unexplained, [was] more likely than not based on the consideration of impermissible factors." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).

Plaintiff points to no evidence that directly links her alleged disabilities with her termination.  Instead, it appears that she relies upon the following circumstantial evidence: (1) the temporal proximity between her medical leave and termination, (2) her historically strong work performance, (3) CHOP's allegedly "half-hearted" and rushed investigation into Plaintiff, and (4) an alleged change in tone during Plaintiff's interactions with her supervisor, Megan Menke.[7]  This evidence, taken together, is insufficient to meet Plaintiff's burden.

Plaintiff returned from her second round of medical leave on January 4, 2021, but she was not suspended until February 25, 2021 or terminated until March 2, 2021.  Pl.'s Timeline. Although "[t]he Third Circuit has established no bright-line rule for a time frame indicative of unusually suggestive temporal proximity," *Albright v. Tr. of Univ. of Pa.*, No. 19-149, 2019 WL 5290541, at *12 (E.D. Pa. Oct. 18, 2019), no case even comes close to finding a seven-week period "unusually suggestive" of discrimination.

And although Plaintiff appears to have been a strong performer on track for promotion, it does not necessarily follow that Plaintiff was terminated because of her alleged disabilities,

---

[7] Plaintiff's reply and sur-reply do not directly address this portion of her prima facie case.  She states that her claim "satisfies the McDonnell-Douglas framework" in a heading but only argues that she was disabled under the ADA.  *See* Pl.'s Opp'n Br. at 11-18.  The list discussed here is based on my own assessment of the available evidence for a disability discrimination claim, drawn from the totality of Plaintiff's arguments.

especially because CHOP readily concedes Plaintiff's strong performance and did not suggest otherwise in terminating her.  Pl.'s Opp'n Br., Ex. E, Menke Dep. at 48:16-24 (acknowledging that Plaintiff was "a very high-functioning operational leader"); Pl.'s Opp'n Br., Ex B, Termination Letter.  Her strong performance may be relevant in evaluating pretext, but it does not so clearly support an inference of disability-based discrimination.

Likewise, Plaintiff claims that CHOP's investigation into her was rushed and "half-hearted" because her legitimate explanation for the timecard discrepancies went ignored.  Pl.'s Sur-Reply at 11.  This again speaks to potential pretext for firing her, but it does not create an intuitive link between her termination and her alleged disabilities.

Lastly, Plaintiff allegedly sensed a "a weirdness" from Megan Menke upon returning to work, testifying that Menke sometimes questioned whether Plaintiff was "able to handle some of [her] job functions."  Pl.'s Dep. at 60:8-61:17.  To the extent that such comments might suggest bias against Plaintiff because of ongoing disabilities, they just as easily suggest a legitimate concern for an employee after returning from medical leave.  Relatedly, Plaintiff has not alleged that anyone at CHOP spoke negatively about her medical conditions or mentioned them at any point in her suspension or termination process.  Pl.'s Dep. at 69-72.

ADA plaintiffs must show that their disability "played a role in the employer's decision[-]making process and that it had a determinative effect on the outcome of that process."  *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007) (citations omitted).  I am persuaded that no reasonable jury could find that Plaintiff has met this standard based on the tenuous connection between her alleged disabilities and the evidence of record.[8]

---

[8] Plaintiff argues in her sur-reply for the application of a "mixed-motive" theory of causation.  Pl.'s Sur-Reply at 10-12.  Under this standard "a plaintiff need only show that the [employer's] unlawful motive was a 'substantial motivating factor' in the adverse employment action."  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (citation omitted).  "Generally speaking, in a 'mixed-motive' case a

Plaintiff dwells at length on pretext.  Had she established a prima facie case, her evidence as to pretext appears stronger.  CHOP claims it terminated Plaintiff for "falsifying her timecard and lying about it."  Def.'s Mot. for Summ. J. at 11.  But Plaintiff repeatedly testified that her supervisor, Megan Menke, instructed her to format her timecard and permitted her to work from home as she had, and Plaintiff denies lying about this.  *See, e.g.*, Pl.'s Dep. at 30:8-31:14, 78:12-79:17, 122:3-16, 125:14-22, 166:10-18.  CHOP representatives have also admitted that they had no written work-from-home policy, meaning Plaintiff's termination ultimately rested in Menke's hands, who may herself have been vulnerable to criticism for lax supervision.  Pl.'s Opp'n Br., Ex. E, Menke Dep. at 24:7-16, 59:8-23; Ex. F, Saunders Dep. at 15:20-16:20, 22:17-23:21, 24:23-27:8; Ex. G, Sabatino Dep. at 13:21-14:7.  But a termination resulting from a dispute with a supervisor over procedure and record keeping, even if unfair, does not constitute actionable discrimination under federal law.  I must therefore grant CHOP's motion for summary judgment on this claim.

B. Plaintiff's ADA retaliation claim fails because she has not established a causal connection between a protected activity and her termination.

The *McDonnell Douglas* framework described above also applies to ADA retaliation claims that rely on circumstantial evidence.  *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022).  "To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the

---

plaintiff claims that an employment decision was based on both legitimate and illegitimate reasons.  Such cases are in contrast to so-called 'pretext' cases, in which a plaintiff claims that an employer's stated justification for an employment decision is false."  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).  Although the Second Amended Complaint presents a "pretext" case, the evidence set forth by Plaintiff meets neither standard, as there is insufficient evidence for a reasonable jury to conclude that Plaintiff was terminated for an unlawful reason, to any extent.

employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (citations omitted). "[U]nlike a general ADA discrimination claim, an ADA retaliation claim does not require that the plaintiff demonstrate a disability within the meaning of the ADA, but only that the plaintiff has a reasonable, good faith belief that [she] was entitled to request the reasonable accommodation [she] requested." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir.2010) (citation omitted).

A request for a reasonable accommodation under the ADA is a protected employee activity, *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 190-91 (3d Cir. 2003), but Plaintiff did not invoke the ADA when she took leave for her surgery or for COVID, and did not formally request any accommodations under the ADA upon her return to work. Pl.'s Opp'n Br., Ex. F, Saunders Dep. at 34:5-35:3. Given that gap in the record, Plaintiff seeks to characterize her prior leaves as protected activity under the ADA. But Plaintiff's one-time request for surgical leave was granted, and if she is asserting retaliation related to that leave, recourse is provided by the FMLA. And as to COVID, Plaintiff used non-FMLA administrative leave time. Pl.'s Dep. at 170:7-172:6. If, upon return to work, Plaintiff's condition necessitated further breaks from work, courts have recognized that "a request for *intermittent* FMLA leave may constitute a request for a reasonable accommodation under the ADA under certain circumstances." *Berardinucci v. Temple Univ.*, No. CV 18-4193, 2020 WL 4201521, at *5 (E.D. Pa. July 22, 2020) (Tucker, J.) (emphasis added) (citing *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 147 (3d Cir. 2017).[9] But those are not the facts here. In the absence of specific requests for leave related to a disability, Plaintiff cannot

---

[9] "Although the Third Circuit did not elaborate upon what those circumstances are [in which FMLA leave may qualify as an ADA accommodation request], district courts within the circuit have. A request for FMLA leave may serve as a request for reasonable accommodation where the employer knows or has reason to believe that the request was based on something other than a one-time event. Thus, a prospective request for periodic FMLA leave may serve as a request for reasonable accommodation." *Beishl v. Cnty. of Bucks*, No. 18-2835, 2018 WL 6812132, at *4 (E.D. Pa. Dec. 27, 2018) (Savage, J.) (citation omitted).

reach back to previous leaves and deem them an exercise of her rights under the ADA.   She thus fails to show protected activity.

Even if I were to treat Plaintiff's prior leaves as protected activity under the ADA, Plaintiff's case would still founder for lack of causation.   To assess causal connection for a retaliation claim, a court looks to "timing and evidence of ongoing antagonism."   *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).   Plaintiff cites the same circumstantial evidence to establish her prima facie case of both discrimination and retaliation under the ADA.   Pl.'s Opp'n Br. 21-22.   As discussed previously, the seven weeks between Plaintiff's medical absences and termination is not "unusually suggestive" of retaliation.   The gap in time extends even further back with respect to Plaintiff's FMLA leave, which ended nearly three months before her termination.   *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (reiterating that there is "no bright line rule," but that three months, "without more, cannot create an inference of causation and defeat summary judgment").

Nor is Plaintiff's purported circumstantial evidence of a "'pattern of antagonism' following the protected conduct" persuasive, as the evidence draws no clear connection to her leaves. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

Plaintiff points to two additional pieces of circumstantial evidence for her retaliation claim: (1) her deposition testimony about an initial conversation in which Menke questioned her timecard, and (2) her deposition testimony that Elise Saunders, Holly Sabatino, and Tracey Widmer "all suddenly changed their behavior towards Plaintiff" following her medical leave.   Pl.'s Opp'n Br. at 21.   These encounters fail to establish a causal connection, especially because Plaintiff has admitted that no negative comments were made to her about her medical leave.   Pl.'s Dep. at 70:6-73:21.   Further, Elise Saunders testified that she did not even know Plaintiff had taken medical

leave. Saunders Dep. at 30:6-9. I find that no reasonable jury could conclude that CHOP retaliated against Plaintiff under the ADA. I will therefore grant summary judgment and dismiss this claim.

C.  <u>Plaintiff's FMLA retaliation claim fails because she has not established a causal relationship between her FMLA-qualifying leave and her termination.</u>

The *McDonnell Douglas* framework also applies to FMLA retaliation claims relying on circumstantial evidence. *Canada*, 49 F.4th at 346. To succeed on an FMLA retaliation claim, a plaintiff must show that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. Univ. of Pitt. Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012). Here, at least, Plaintiff can show protected activity in the form of her leave for surgery. The question then comes whether the temporal proximity between the protected activity and the adverse action is "unduly suggestive" of retaliation, and courts further consider whether "the proffered evidence, looked at as a whole, may suffice to raise the inference" of retaliation. *Id.* at 307 (citations omitted). Plaintiff points to the same causation evidence for this claim as her ADA retaliation claim. Pl.'s Opp'n Br. at 23. Applying similar reasoning here, I find that no reasonable jury could conclude that CHOP retaliated against Plaintiff under the FMLA and must grant CHOP's motion for summary judgment on this claim.

IV.  <u>**Conclusion**</u>

For the reasons stated above, I will grant Defendant CHOP's Motion for Summary Judgment for each of Plaintiff's claims and dismiss Plaintiff's Second Amended Complaint with prejudice.

<u>/s/ Gerald Austin McHugh</u>
United States District Judge